**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 20, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

REPUBLIC UNDERWRITERS
INSURANCE COMPANY;
SOUTHERN INSURANCE
COMPANY,

          Plaintiffs-Appellants,

v.

KENNETH MOORE; LINDA
MOORE; CYNTHIA INGLE; DONNA
CRAFTON; JIM CRAFTON; CINDY
CALL; JAKE BEAVER; SHEILA
BEAVER; BB; JACK BENNETT;
MARY CATHERINE BENNETT;
KENNETH BIRKES; CONNIE
BIRKES; STACY MITCHELL; EC;
ROYAL DUNN; ERIC GIBSON;
KENDRA GIBSON; KG; ANITA
HAYES; AH; ROBERT HANSEN;
CHRISTINE HANSEN; DH; HH;
JUSTIN JOHNSON; BELINDA
JOHNSON; SJ; MATTHEW
MITCHELL; JM; GERRY MORTON;
REBECCA MORTON; EM; JOHN
DOE, sued as J. Doe # 7-99; CAITLIN
M SIMPSON; KATHERINE
ELIZABETH REID; CHRISTI
SANDERS; ELLIS BUXTON; LINDA
CASEY-BUXTON; HELENE
LANKFORD; KEVIN CULVER;
RAYMOND GRENINGER;
JONATHAN YBARRA; LU ETTA
MINTON; STACY MITCHELL; TOM
PRAG; BECKY PRAG; PATRINA
WADDLE,

No. 11-5075
(D.C. No. 4:09-CV-00741-PJC)
(N.D. Okla.)

Defendants-Appellees.

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH** and **BALDOCK**, Circuit Judges, and **BRORBY**, Senior Circuit Judge.

This insurance dispute arose after several hundred people were infected with E. coli in the largest outbreak of its kind in the country. Many people were hospitalized and one person died after eating food contaminated with the bacteria. The food was prepared and served by the Country Cottage Restaurant, both at the restaurant location and at a catered church event. Reasoning that the food was prepared and served at two different places, a magistrate judge concluded that there were two "occurrences" under the applicable insurance policies, and therefore the pertinent aggregate limits of the policies applied rather than their "per occurrence" limits.[1] We exercise jurisdiction under 28 U.S.C. § 1291 and now reverse the magistrate judge's decision.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] The parties consented to the jurisdiction of a magistrate judge. *See* 28 U.S.C. § 636(c).

I.

The facts are undisputed. The Country Cottage Restaurant was preparing and serving E. coli-contaminated food between August 15 and August 25, 2008. Some 341 people were infected, 21 of whom consumed food at a church gathering catered by the restaurant; the rest were sickened after eating at the restaurant. There was one fatality. Some food served at the church was prepared at the restaurant, while other food was prepared onsite at the church event.

Insurers, who provided primary and secondary coverage to the restaurant for "bodily injury" caused by an "occurrence," Aplt. App., Vol. 1 at 144, 174, took the position that the entire contamination period constituted one continuing occurrence as defined by the respective policies.[2] When it became apparent that damages would exceed the policies' limits, insurers brought this interpleader action seeking both declaratory relief that the "per occurrence" limits applied, providing a total of $3 million in coverage, and leave to interplead the $3 million. Alternatively, insurers claimed that if there were multiple occurrences, Republic's products-completed operations aggregate limit applied, providing $2 million in

---

[2]     Insurers are Republic Underwriters Insurance Company ("Republic") and Southern Insurance Company ("Southern"). Republic's policy provides a per-occurrence limit of $1 million, a general aggregate limit of $2 million, and a products-completed operations aggregate limit of $2 million. Southern's policy provides a per-occurrence limit of $2 million and an aggregate limit of $2 million. Southern's coverage applies "when the 'underlying insurance' [Republic's] does not provide coverage or the limits of 'underlying insurance' have been exhausted." Aplt. App., Vol. 1 at 172, 174.

coverage, along with Southern's aggregate limit of $2 million, for a total of $4 million in coverage.

On cross-motions for summary judgment, insurers argued that the single "event giving rise to all of the Claimants' alleged injuries and damages was Country Cottage's preparation, handling, or storage of food that purportedly became contaminated with E. coli." Aplt. App., Vol. 1 at 60. Insurers relied on our decision in *Business Interiors, Inc. v. Aetna Casualty & Surety Co.*, in which we held that "an occurrence is determined by the cause or causes of the resulting injury." 751 F.2d 361, 363 (10th Cir. 1984) (quotation omitted). Because all the injuries could be traced back to the ongoing preparation, handling, or storage of contaminated food, insurers insisted there was but one occurrence.

Claimants rejected this contention. They acknowledged that the outbreak occurred at the restaurant, but they pointed to an investigation report issued by the Oklahoma Department of Health, which was inconclusive as to how the bacteria contaminated the restaurant and spread during the outbreak. Claimants observed that the report suggested multiple likely contributing factors, including contamination by food-handlers, as well as cross-contamination from food-preparation equipment, counter surfaces, and storage areas. Because none of these likely modes of transmission could be confirmed as the single cause for the spread of E. coli, claimants argued that unlike *Business Interiors*, insurers here could cite no single cause of the losses. Instead, claimants asserted that the

-4-

number of occurrences equaled eight alleged acts of negligence, including the failure to adequately maintain sanitary conditions of the restaurant's food, drinks, water, premises, and employees; the failure to train employees how to prevent the spread of E. coli; and the failure to design and implement a hand-washing policy.

Apart from those arguments, certain claimants ("cross-movants") filed a cross-motion for partial summary judgment, arguing that each individual sale of contaminated food represented a separate occurrence. They argued that under this court's decision in *Farmers Alliance Mutual Insurance Co. v. Salazar*, 77 F.3d 1291, 1296-97 (10th Cir. 1996), an occurrence is marked by its immediately surrounding circumstances. Since multiple people were injured consuming different foods prepared by different food-handlers at different times and at two different locations, cross-movants argued that there were necessarily multiple occurrences.

Additionally, cross-movants argued that while Republic's general aggregate limit ("GAL") covered injuries sustained at the restaurant, Republic's products-completed operations aggregate limit ("PCOAL") separately covered injuries sustained at the church gathering. Cross-movants reasoned that the GAL excluded from coverage the products-completed operations hazard ("PCOH"), which separately covered injuries sustained off-premises under the PCOAL.[3]

---

[3]     The relevant policy provisions state: "The General Aggregate Limit is the
                                                                    (continued...)

Thus, according to cross-movants, Republic's GAL provided $2 million in coverage for injuries sustained at the restaurant, its PCOAL provided $2 million in coverage for injuries sustained at the church gathering, and Southern's aggregate limit provided another $2 million, all for a total of $6 million in coverage.

Insurers disputed cross-movants' application of *Salazar* for purposes of identifying the relevant occurrence, but insurers also pointed out that the PCOH definition had been modified by an endorsement. They claimed the endorsement broadened the scope of the PCOH so as to encompass all claims covered under the PCOAL.[4] Thus, insurers insisted that the GAL was no longer implicated and all

---

[3](...continued)
most we will pay for the sum of . . . [d]amages under Coverage A, *except damages because of 'bodily injury' . . . included in the 'products-completed operations hazard.'"* Aplt. App., Vol. 1 at 153 (emphasis added). By contrast, the PCOAL provides that "[t]he Products-Completed Operations Aggregate Limit is the most we will pay under Coverage A for damages *because of "bodily injury" . . . included in the [PCOH]".* *Id.* (emphasis added). Finally, the PCOH is defined to "[i]nclude[] all 'bodily injury' . . . occurring away from premises you own or rent and arising out of 'your product' or 'your work' . . . ." *Id.* at 157.

[4]     The PCOH endorsement states:

**SCHEDULE**
**Description of Premises and Operations:**
     RESTAURANTS
     (If no entry appears above, information required to complete this endorsement will be shown in the Declarations as applicable to this endorsement.)

     With respect to "bodily injury" or "property damage" arising out of "your products" manufactured, sold, handled or distributed:

                                                                  (continued...)

-6-

claims covered by the Republic policy fell under the $2 million PCOAL.

Cross-movants countered that because the church was not identified in the

endorsement, the endorsement could apply only if the injuries sustained at the

church arose from the manufacture, sale, handling, or distribution of food "on,

from or in connection with the use of" the restaurant's premises, which

cross-movants asserted the injuries did not. Aplt. App., Vol. 1 at 166.

Accordingly, cross-movants maintained there was a total availability of coverage

of $6 million.

The magistrate judge ultimately concluded there was a total of $4 million in

available coverage under Republic's PCOAL and Southern's general aggregate

limit. The magistrate judge reasoned, however, that the basis for finding multiple

occurrences was neither the eight alleged acts of negligence nor each individual

sale of contaminated food, but rather the two separate locations where the food

_____

[4](...continued)
> 1. On, from or in connection with the use of any premises described in the Schedule, or
> 2. In connection with the conduct of any operation described in the Schedule, when conducted by you or on your behalf,
>
> Paragraph a. of the definition of "Products-completed operations hazard" in the DEFINITIONS Section is replaced by the following:
> "Products-completed operations hazard":
> a. Includes all "bodily injury" and "property damage" that arises out of "your products" if the "bodily injury" or "property damage" occurs after you have relinquished possession of those products.

Aplt. App., Vol. 1 at 166.

was prepared and served.  The magistrate judge began with the meaning of "occurrence," which both policies define as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* at 157, 187.  He agreed that the causation rule from *Business Interiors* required the court to examine the cause of the injuries.  But without pinpointing the definitive cause of claimants' injuries—that is, without resolving whether the injuries were singularly the result of the preparation, handling, and storage of contaminated food or the various factors that led to the contamination—the magistrate judge concluded that under *Salazar*, there were two occurrences because the injuries were caused at two different places.

Insurers filed a "Motion for Clarification," which the magistrate judge denied.  The magistrate judge explained that his decision had not rejected either insurers' or claimants' cause theories, but rather, he did "not reach the argument because the Court [found] more than one occurrence even under the Insurers' more limiting cause theory, due to the geographical distinction between the" restaurant and the church.[5]  Aplt. App., Vol. III at 847 (quotation omitted).  Dissatisfied with this explanation, insurers appealed.

In this court, insurers insist that the only occurrence was the continuing preparation, handling, and storage of contaminated food.  They refer us, as they

---

[5]     Our disposition forecloses claimants' alternative cause theories.

-8-

did the magistrate judge, to *Business Interiors*, where we applied the causation rule to conclude that an employee's continuing dishonesty in committing multiple acts of fraud constituted one occurrence. According to insurers, *Salazar* is distinguishable and *Business Interiors* controls because all injuries can be similarly traced back to the restaurant's continuing preparation and service of contaminated food, notwithstanding the two locations where injuries were caused. Under this approach, insurers contend, the separate locales cannot support a finding of two occurrences.

## II.

We review the magistrate judge's summary judgment decision de novo. *Greystone Constr., Inc. v. Nat'l Fire & Marine Ins. Co.*, 661 F.3d 1272, 1277 (10th Cir. 2011). In this diversity case, the facts are undisputed and the only question is whether the preparation and service of contaminated food at two different locations supports a finding of two occurrences rather than one for purposes of liability coverage.[6] This issue is resolved by proper application of the causation rule, which we followed in *Business Interiors*, 751 F.2d at 363.

The causation rule states that "an occurrence is determined by the cause or causes of the resulting injury." *Id.* (quotation omitted). In *Business Interiors,* we applied the causation rule to determine whether the claimed loss—$53,000 taken

---

[6] The parties do not dispute that this case is governed by Oklahoma law, which, we note, governed our decisions in both *Business Interiors* and *Salazar*.

by the insured's employee who forged or altered forty separate checks—was caused by the employee's singularly dishonest intent or forty separate acts of dishonesty. *See id.* at 362. We concluded that "the cause of Business Interiors' loss was the continued dishonesty of one employee," and thus "the employee's fraudulent acts constituted a single loss for Business Interiors." *Id.* at 363. Insurers here argue that the injuries were similarly caused by the continued preparation and service of contaminated food. We agree.

The causation rule requires that we determine whether "there was but one proximate, uninterrupted, and continuing cause which resulted in all the injuries and damage." *Appalachian Ins. Co. v. Liberty Mut. Ins. Co.*, 676 F.2d 56, 61 (3d Cir. 1982) (brackets and quotations omitted). "As long as the injuries stem from one proximate cause[,] there is a single occurrence." *Id.* Here, all the injuries were proximately caused by the restaurant's ongoing preparation of contaminated food. Hence, there was but one occurrence. It does not matter that the food was served with other food items prepared at another location because the contamination originated at the restaurant. Nor does it matter that the precise underlying cause of the contamination is unknown because the fact remains that the contamination originated at the restaurant.

The magistrate judge concluded that there were two occurrences based on our decision in *Salazar*, but that case is inapposite. In *Salazar*, a mother and son were both insured under a homeowner's policy that covered "bodily injury . . .

caused by an occurrence and arising out of the ownership, maintenance or use of the" home. 77 F.3d at 1295. The mother had negligently supervised her son's possession of two guns that he and a friend later used to murder someone at another location. *Id.* at 1293. The insurer denied coverage, but the district court determined that the mother's negligent supervision was a covered occurrence. *Id.* We reversed that ruling. *Id.* at 1297. We observed that whether there was a covered occurrence depended on "what event or events in the causal chain leading to [the injury] should be the focus of [the court's] inquiry." *Id.* at 1295. We concluded that the time and place of the injury controlled, *id.* at 1296, which precluded coverage for the mother's antecedent negligence.

The magistrate judge read *Salazar* to require separate occurrences based on the separate locations where the injuries occurred in this case, but that approach conflicts with the causation rule we previously adopted in *Business Interiors*. This conflict need not arise, however, because when properly read, these cases involve different inquiries tailored to different purposes.

*Salazar* did not address the issue we confront here—the number of occurrences—but rather the distinct question of whether there was a covered occurrence at all. To answer that question, *Salazar* analogized to cases examining the time and place of an occurrence, observing that the issue of timing generally arose when "the initial wrongdoing in a causal chain fell within the policy period but the resulting injury occurred after the expiration of the policy." *Id.* at 1295.

-11-

In that context, we noted "it is well-settled that the time of an occurrence of an accident . . . is not the time when the wrongful act was committed, but the time when the complaining party was actually damaged." *Id.* at 1296 (quotation omitted). This is because an insured reasonably expects to be covered during the policy period, but has no reason to seek indemnification until an injury actually occurs, even if the proximate cause of the injury occurred earlier in time. As for the place of an occurrence, which is typically disputed when coverage is limited to a particular territorial jurisdiction or work site, we held that "[t]he location of an 'occurrence' is determined by the place where the injury happened; it does not matter that a precipitating event took place elsewhere." *Id.*

*Salazar* naturally examined the time and place of the injury to determine whether there was an occurrence because only if there is an injury can there be any possibility of an occurrence. *See Appalachian Ins. Co.*, 676 F.2d at 62 (recognizing that "injury is a prerequisite to liability"). Hence, we focused our analysis on the circumstances immediately surrounding the injury:

> We find that when determining whether a bodily injury was caused by an 'occurrence' *the question of whether there was an 'occurrence' should be resolved by focusing on the injury and its immediately attendant causative circumstances.* If the time and place of an 'occurrence' are determined by the time and place of the injury, then the acts which are said to constitute the 'occurrence' must necessarily fall within the same temporal and spatial parameters.

*Salazar*, 77 F.3d at 1296 (emphasis added). But this does not mean that every injury that occurs at a different time and place necessarily constitutes a separate

-12-

occurrence. Consequently, the test used in *Salazar* is ill-suited to the distinct question of how many occurrences should be attributed to circumstances that have given rise to multiple injuries.

Instead, as explained above, the proper test for ascertaining the number of occurrences is whether there was one or more causes of the injuries. *See Business Interiors*, 751 F.2d at 363. Other courts have recognized the distinct tests employed for determining the time or place of an occurrence and the number of occurrences. *See, e.g., Appalachian Ins. Co.*, 676 F.2d at 61-62 (distinguishing between the test used for determining the time of an occurrence, which is "when the injurious effects of the occurrence took place," and the causation test used for determining the number of occurrences in circumstances involving multiple injuries); *Ace Am. Ins. Co. v. RC2 Corp.*, 600 F.3d 763, 768-69 (7th Cir. 2010) (distinguishing between the test used for determining the place of an occurrence and the causation test used for determining the number of occurrences in circumstances involving multiple injuries). Applying the causation rule here leads to the inescapable conclusion that there was only one occurrence. All the injuries were caused by the restaurant's ongoing preparation of contaminated food. That the contaminated food was prepared and served at another location is irrelevant.

III.

Accordingly, the decision of the magistrate judge is REVERSED, and this case is REMANDED to the district court with instructions to enter judgment in favor of appellants consistent with this order and judgment.

Entered for the Court

Wade Brorby
Senior Circuit Judge